# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AMBER WISE, *et al*., | ) | CASE NO. 5:21-cv-2203 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| GEORGE T. MAIER, STARK COUNTY | ) | |
| SHERIFF, *et al*., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This civil rights action arises from the December 10, 2019, suicide of decedent, David M. Wise ("Wise"), while in pre-trial custody in the Stark County Jail ("SCJ"). Now before the Court are three motions for summary judgment. The first is the motion of defendants George T. Maier, Stark County Sheriff (the "Sheriff"); Bill Smith, Janet Creighton, and Richard Regula (the "Commissioners"); and Sgt. James Stevic ("Stevic"), Sgt. Eric Changet ("Changet"), C.O. Joseph Stephey ("Stephey"), C.O. Nathan Thomas ("Thomas"), and C.O. Danny Thompson ("Thompson") (the "Officers") (collectively, "Stark County Defendants"). (Doc. No. 58.) The second is the motion of defendants Tammy Harmon-Rodriguez ("Harmon-Rodriguez") and Deborah Vaughan ("Vaughan") (collectively, "VitalCore Defendants"). (Doc. No. 57.) The third is brought by plaintiffs, Amber Wise and Attorney J. Max Haupt, and seeks partial summary judgment. (Doc. No. 56.) Each summary judgment motion is fully briefed and ripe for resolution. (*See* Doc. No. 61 (Plaintiffs' Response to Stark County Defendants' Motion); Doc. No. 67 (Stark County Defendants' Reply); Doc. No. 62 (Plaintiffs' Response to VitalCore Defendants' Motion);

Doc. No. 66 (VitalCore Defendants' Reply); Doc. No. 60 (VitalCore Defendants' Response to Plaintiffs' Motion); Doc. No. 63 (Stark County Defendants' Response to Plaintiffs' Motion); Doc. No. 65 (Plaintiffs' Reply in Response to Stark County Defendants' Response).)

## I.    BACKGROUND

Many of the background facts are well-documented and beyond dispute. Where there is disagreement, the Court will note it and, in applying those facts to the various summary judgment motions, the Court will construe the facts "in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc*., 336 F.3d 503, 506 (6th Cir 2003) (citation omitted).

SCJ is a 526-bed adult jail housing inmates booked by a variety of law enforcement agencies within Stark County, Ohio. (Doc. No. 44 (Expert Report of Jeffrey S. Carter) ¶ 37.) For purposes of summary judgment only, no party takes issue with the following: at all times relevant to this litigation, SCJ was under the auspice and control of the Sheriff and the Commissioners; the Officers were employed by Stark County and worked at SCJ; Stark County had a contractual arrangement with VitalCore to provide mental health services to its inmates at SCJ; and Harmon-Rodriguez and Vaughan were employed by VitalCore.

Chapter 5120 of the Ohio Administrative Code sets forth the minimum standards for adult jail housing facilities in the State of Ohio. (*Id*. ¶ 34.) Ohio Admin. Code § 5120:1-8-09(A) requires each jail to have a designated health authority "with responsibility for health and/or mental health care services" to be administered at the facility. Section 5120:1-8-09(C) requires health trained personnel to conduct a "written medical, dental and mental health receiving screening on each inmate upon arrival at the jail and prior to being placed in general population." As part of this screening, an initial "[s]uicidal risk assessment" must be made. § 5120:1-8-9(C)(1)(j). Within

2

fourteen days of arrival, a licensed nurse (or other appropriate medical provider) must complete a more in-depth health appraisal to "determine the medical and mental health condition for each inmate in custody." § 5120:1-8-9(D). Such an appraisal must include a full "[m]ental health assessment." § 5120:1-8-9(D)(6). Additionally, the health authority must have a suicide prevention plan designed to identify and respond to suicidal and potentially suicidal inmates and actions involving self-harm. § 5120:1-8-9(N).

SCJ has several policies and procedures that are relevant to the present action. First, SCJ Policy 80302.00 sets forth the steps intake corrections officers take when receiving a new arrestee, which includes an initial screening by SCJ staff. (Doc. No. 44-14 (SCJ Policies), at 16–28.[1]) Additionally, SCJ Policy 80307.00 requires contract medical personnel to conduct a preliminary Health/History Evaluation for all newly received inmates. (*Id.* at 48.) Finally, SCJ has a Suicide Prevention and Response Plan. (*See id.* at 76–91.) The Plan includes, in part, identification of potentially suicidal inmates (SCJ Policy 83752.00), referral and placement of inmates on suicide precautions (SCJ Policy 83753.00), housing of suicidal inmates (SCJ Policy 83754.00), monitoring of such inmates (SCJ Policy 83755.00), routine assessment of inmates for warning signs (SCJ Policy 83756.00), communication (SCJ Policy 83758.00), training (SCJ Policy 83759.00), and intervention in cases involving a suicide attempt (SCJ Policy 83757.00). There is no dispute that SCJ's Suicide Prevention and Response Plan complies with the requirements of the Ohio Administrative Code for such plans. (Doc. No. 39 (Expert Report of Robert J. Marcello), at 7; *see* Doc. No. 44 ¶ 71.)

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

### A.  Wise's History of Incarceration and Suicide Attempts

The parties agree that Wise suffered from a variety of mental health problems. (Doc. No. 1 (Complaint) ¶ 15; *see* Doc. No. 54 (Deposition of Danny Thompson), at 8–9.) Wise also had a history of incarceration in SCJ and was generally familiar to many of the employees of SCJ. (Doc. No. 53 (Deposition of Eric Changet), at 24 (describing Wise as a "regular" at SCJ); Doc. No. 54, at 7–8 (familiar with Wise from past incarcerations at SCJ).)

Wise's past incarcerations were often punctuated by unsuccessful efforts to take his own life. On June 27, 2011, while incarcerated at SCJ, Wise attempted suicide by hanging himself in his cell. (Doc. No. 56-2 (Incident Report).) He was discovered by a deputy sheriff and had to be cut down and treated by medics and the Canton Fire Department. (*Id*. at 6.) On June 14, 2018, during another period of incarceration at SCJ, Wise was discovered to have "wrapped [a] sheet around his neck in [an] attempt to harm himself." (Doc. No. 56-5 (SCJ Progress Notes), at 2.) On June 15, 2018, while on precaution status[2] due to his suicide attempt the previous day, Wise climbed onto an 8-foot-high shelf and threatened to jump headfirst off the shelf to cause himself harm. (Doc. No. 56-6 (SCJ Incident Report), at 1.) He eventually removed himself safely from the shelf after a SCJ corrections officer administered a burst of Oleoresin Capsicum Spray. (*Id*.)

On December 19, 2018, Wise was ordered to be housed in the psychiatric section of SCJ, placed on 15-minute observations for self-harm, and was observed to have displayed self-injurious or suicidal behavior during incarceration. (Doc. No. 56-8 (SCJ Transfer to Heartland Behavioral).) The documentation accompanying this housing decision reflects that Wise "represent[ed] a

---

[2] As will be discussed more thoroughly below, inmates at SCJ who are assessed to be at risk of harming themselves or others may be placed in precautionary status wherein they receive more frequent checks from staff and are often given special blankets, smocks, and mattresses that are designed to minimize their ability to cause harm to themselves. (Doc. No. 53, at 34–35.)

substantial risk of physical harm to [him]self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm[.]" (*Id*. at 2.)

During a subsequent period of incarceration in June 2019, Wise was again placed on precautionary status. The SCJ Mental Health/Psychological Screening notes Wise "hung self in catwalk 6/27/11[,] wrapped sheet @ neck 7/18/11" and that Wise stated, "if I had a stake I would put it through everyone's eyes right now[.]" (Doc. No. 56-9, at 2.) During the next several days, documentation prepared by Harmon-Rodriguez reflects that Wise had been placed on precautions "for self-harm & odd behaviors[,]" based on comments that he "believe[ed] [he] deserve[d] death[,]" that he was seeing things, and that the trees were "stalking" him. (Doc. No. 56-11 (Psychiatric Precaution Flow Sheet and Screening), at 2.) The documentation also reflects that Wise had made other bizarre comments, including that he believed that he was being pursued by aliens and that he was the President of the United States.  (*Id*. at 3.) Finally, on August 9, 2019, Harmon-Rodriquez signed an Application for Emergency Admission to Heartland Behavioral Health because Wise displayed "[s]elf-injurious or suicidal behavior during incarceration[,]" and was "currently on suicide watch/precautions[.]" (Doc. No. 62-14 (Transfer Form), at 4.)[3]

**B.  Wise's December 7, 2019, Booking into SCJ**

On December 7, 2019, the Alliance Police Department ("APD") responded to a call at Aultman Alliance Community Hospital. (Doc. No. 58-1 (APD Incident Report), at 7.) Wise had received patient care at the hospital and was set to be discharged when he became violent and

---

[3] Other SCJ records documented Wise's struggles with his mental health, recurring thoughts of suicide, and bizarre comments to staff at SCJ. (*See generally* Doc. No. 56-7 (SCJ Admission Record and Related Documents); Doc. No. 56-9; Doc. No. 56-10 (SCJ Jail Screening and Related Documents); Doc. No. 56-11.)

began destroying hospital property, before he was ultimately restrained by hospital security.[4] During the course of the struggle, Wise pushed a member of security and attempted to strike one of the hospital's nurses. (*Id.*)  He was taken into custody by APD and charged with two counts of assault on a medical worker and vandalism. The hospital's discharge paperwork reflected that Wise had been "medically cleared for jail."[5] (Doc. No. 58-2, at 2.) Wise was subsequently transported to SCJ.

At 6:35 p.m., on December 7, 2019, a SCJ corrections officer prepared a "pre-booking screening form" for Wise. (Doc. No. 58-3 (Pre-Booking Screening Form).) Next to the question "[d]oes the prisoners' behavior suggest the risk of suicide?" the officer circled "NO." (*Id.* at 2.) The officer also indicated that Wise posed "a risk to staff or others of an assault[.]" (*Id.*) Approximately ten minutes later, at 6:45 p.m., an employee of VitalCore performed a "pre-booking healthcare screen" on Wise.[6] (Doc. No. 58-4 (Pre-Booking Healthcare Screen), at 2.) When Wise was asked if he had "any current thoughts of harming" himself, he responded that he did not. (*Id.*)

Wise became verbally resistive with SCJ personnel as they attempted to complete the booking process, requiring Stevic—the on-duty supervisor—to assist with fingerprinting and photographing of Wise. (Doc. No. 58-5 (Affidavit of James Stevic) ¶¶ 5–6.) After he was

---

[4] Plaintiffs also cite the Alliance Arrest Report. (Doc. No. 56-1.) In the narrative attached to the report, one arresting officer indicated that hospital staff reported that Wise became "delusional about cameras that were 'hidden' in the restroom" before he destroyed hospital property and assaulted staff members. (*Id*. at 2.) There is nothing in the record to suggest that SCJ corrections officers or VitalCore defendants had access to this report or were aware of its contents prior to December 10, 2019, and plaintiffs do not suggest otherwise.

[5] Medical clearance is a finding by a licensed medical practitioner that a person has no medical issues or problems that would preclude him or her from being incarcerated. (Doc. No. 55 (Deposition of Robert Marcello, Ph.D.), at 27–28.)

[6] The healthcare screen appears to have been performed by VitalCore nurse Derek Ward but the Admission Record note and Pre-Booking Healthcare Screen were both signed by Megan Hunkus, R.N. (*See* Doc. No. 44 ¶ 61.)

fingerprinted and photographed, Wise was escorted to the next step in the booking process. While en route, Wise became physically resistive and combative towards the SCJ staff who were escorting him. (*Id.* ¶¶ 7–8.) A staff member was required to forcefully take Wise to the ground to subdue him and prevent any further aggression. (*Id.* ¶ 9.)

### C.  Wise is Placed in a Control Cell

After Wise was subdued, Stevic directed that Wise be placed in a control cell located in the D-Section of SCJ. (*Id.* ¶ 10.) According to Stevic, he made the decision to place Wise in a control cell solely due to the fact that Wise had become physically aggressive and resistive towards SCJ personnel during the booking process and, therefore, posed a threat to the safety of SCJ staff. (*Id.* ¶ 10(b)–(c).) There is nothing in the record to suggest that the decision was related to any perceived risk of Wise committing self-harm or suicide. (*See id.* ¶ 10(a).) Stevic also made the decision to give Wise a precautionary blanket because he remembered from prior encounters with Wise that he had a tendency to flush his blankets down the toilet to cause flooding and precautionary blankets are not easily flushed.[7] (*Id.* ¶ 11(a)–(b).) When Stevic left SCJ at the conclusion of his shift, Wise was quietly sleeping in his control cell. (*Id.* ¶ 18.)

### D.  Wise Requests Relocation and SCJ Personnel Investigate Wise's Placement

When Thompson commenced his shift in D-Section on December 9, 2019, he noticed that Wise was occupying a control cell. (Doc. No. 54, at 10.) He had no information as to why Wise had been given such a placement, so he looked into the nature of, and reasons for, it. (*Id.* at 10, 12; Doc. No. 56-12 (Stark County Sheriff's Office Report of Investigation), at 9.) At the direction of

---

[7] A precautionary (or safety) blanket is "routinely given to those inmates on suicide watch due to it being difficult to tear and being used as a method of committing suicide." (Doc. No. 44 ¶ 46.)

his supervisor—Sergeant Seaman—Thompson began by checking the "pass down," which is a brief update and status report (in either verbal or written form) that an outgoing shift employee provides to the incoming shift personnel to make them aware of any issues that might be pertinent to the next shift. (Doc. No. 54, at 13; *see* Doc. No. 58-8 ¶ 10; Doc. No. 58-10 (Affidavit of Joseph Stephey) ¶ 7.) The pass down notes only indicated that Wise had been "combative." (Doc. No. 54, at 13.) Sergeant Seaman then checked JAMIN—the electronic information filing system for SCJ— but reported to Thompson that there was nothing about the placement there. (*Id*. at 14–15.) Thompson then contacted VitalCore and was advised by Harmon-Rodriguez that mental health employees had no knowledge as to why Wise was in a control cell and that she would look into it.[8] (*Id*. at 15–16.)

The parties dispute the nature of the subsequent communications between Thompson, Harmon-Rodriguez, and Vaughan. Thompson testified that, at some point, he specifically asked Vaughan if a mental health staff member could see Wise. (Doc. No. 54, at 21, 84.) He reported that Vaughan said she would pass along to Harmon-Rodriguez the request to have Wise seen by a mental health employee. (*Id*. at 22.) The final contact Thompson believes he had with any VitalCore employee was a conversation he had with Harmon-Rodriguez. According to Thompson, Harmon-Rodriguez advised that she was going on a break but that, shortly thereafter, she would "grab" Wise's chart and see him. (*Id*. at 49.) In all, Thompson believes that he spoke with Harmon-Rodriguez and Vaughan a combined total of four times, but that neither individual ever reported back to him or, to his knowledge, ever checked on Wise. (*Id*. at 42–43.) Thompson left for the day

---

[8] Thompson also inquired as to a second individual—David Kennedy—who was also housed in a control cell in D-Section. Harmon-Rodriguez indicated that she wanted to see Kennedy and that he should be placed on precautions. (*Id*. at 17.)

without ever determining the reason for Wise's placement in a control cell. (*Id*. at 41.)

While Harmon-Rodriguez remembered speaking with Thompson on December 9, 2019, she adamantly denied that Thompson (or any other SCJ staff member) ever requested that she see Wise for an evaluation. (Doc. No. 52 (Deposition of Tammy Harmon-Rodriguez), at 84, 90, 93, 106.) Rather, she only recalled being asked if there was a mental health reason for Wise's placement in a control cell. She further testified that, while she had past encounters with Wise, she never "put the pieces together" in December 2019 that Wise had previously attempted suicide at SCJ. (*Id*. at 94; *see id*. 97–98.)

When Changet began his shift in D-Section on December 10, 2019, Changet also noticed that Wise was in one of the control cells, though, like Thompson, he did not have any information that would suggest the reason for the placement. (Doc. No. 53, at 9.) He began to investigate the matter, first by checking on JAMIN, but found nothing there that suggested Wise was on suicide watch or was otherwise subject to suicide-related precautions.[9] (*Id*. at 10–11, 16–17.)

At some point on December 10, 2019, Wise complained to another SCJ employee—Officer Todd McCoy ("McCoy")—that he believed he was being housed in a control cell as a form of punishment and requested that he be relocated. (Doc. No. 58-8 (Affidavit of Todd McCoy) ¶¶ 5–6.) McCoy inquired of Harmon-Rodriguez if Wise had any mental health precautions, and she advised him that he did not. (*Id*. ¶ 7.) McCoy reported his findings, and his conversation with Harmon-Rodriguez, to Changet. (*Id*. ¶ 8.)

---

[9] Changet testified that he was typically briefed when he started a shift as to why inmates in D-Section were in control cells. (*Id*. at 13.) He explained that this briefing might come in the form of a pass down or a "blurb," which is a form mental health employees fill out listing any precautions that apply to a particular inmate. (*Id*. at 10, 13; *see* Doc. No. 52, at 22–23.)

Changet continued his investigation. He made an inquiry of the supervisor for VitalCore—a woman named Ann, a non-party to this action—and asked why Wise was in a control cell with limited items, such as a precautionary blanket. (Doc. No. 53, at 21.) She advised Changet that she would investigate the matter and get back to him. (*Id*. at 21–22.) She eventually reported that Wise's placement in a control cell was a "security issue, it's not a mental health issue." (*Id*. at 22.) Having been advised that Wise's placement was not related to any mental health concerns, Changet made the decision to move him to a medical cell in the D-Front section of SCJ. (*Id*.; *see also* Doc. No. 56-12, at 8.)

### E. Wise is Moved Out of a Control Cell and Takes His Life

Thomas was working in the D-Front Section on December 10, 2019, when Wise was relocated there. (Doc. No. 58-9 (Affidavit of Nathan Thomas) ¶ 4.) During one of his rounds in D-Front, Thomas noticed Wise spitting out of his cell onto the catwalk. (*Id*. ¶ 5.) Thomas instructed Wise not to spit and Wise complied with this request. (*Id*. ¶¶ 6–7.) Other than spitting, Thomas encountered no issues with Wise. (*Id*. ¶ 8.) At the conclusion of his shift, Thomas provided a pass down to Stephey, who was coming on in relief. (*Id*. ¶ 9; Doc. No. 58-10 ¶ 7.) During the pass down, Thomas informed Stephey that Wise had been spitting earlier but that he was otherwise cooperative and presented no further issues during his shift. (Doc. No. 58-9 ¶ 11.) When Thomas left SCJ that day, Wise was fine and was not experiencing any behavioral or other issues that caused Thomas to have any concern. (*Id*. ¶ 12.)

At approximately 4:50 p.m. on December 10, 2019, Stephey was performing a standard round of D-Front when he discovered Wise laying against his cell with what appeared to be a sheet around his neck. (Doc. No. 58-10 ¶ 8.) Stephey immediately used his radio to report a "Code 58,"

which signifies that an inmate is in the process of or has already committed suicide or some other act of self-harm. (*Id.* ¶ 10; Doc. No. 54, at 57.) Stephey's shift supervisor, Sergeant Woods, immediately responded to the scene and the two men worked to unlock Wise's cell so that they could enter and intervene. (Doc. No. 58-10 ¶ 11.) Once the doors were unlocked, other SCJ personnel arrived and held Wise up while Stephey used a "cut-down" knife to free Wise from the sheet. (*Id.* ¶ 12.)

Once Wise was free from the sheet, SCJ officers performed CPR until medical providers arrived on scene. (*Id.* ¶ 15.) SCJ officers and medical staff were able to stabilize Wise and he was transported to Mercy Medical Center. At approximately 11:38 a.m. on December 12, 2019, Wise was removed from life support, and Wise was pronounced dead at 12:30 p.m. (Doc. No. 1 ¶¶ 62–63.)

### F. The Investigations

On December 11, 2019, the Stark County Sheriff's Office opened an investigation into the events surrounding Wise's suicide. (*See generally* Doc. No. 56-12.) As part of the investigation, Sgt. Craig Kennedy viewed the scene, reviewed documents, and conducted interviews. Interviews of the inmates housed near Wise's cell in D-Front revealed that, immediately before Wise's suicide, Wise began making bizarre comments about "black people, green people, and how all of them were going to die at midnight and how all of them were dead men walking." (*Id.* at 6.) Sgt. Kennedy was also advised by inmates that Wise made comments about turning into a werewolf at midnight. (*Id.*) One inmate also reported seeing Wise place a sheet on the bars of his cell but assumed he did so for privacy while using the restroom. (*Id.*) There is nothing in the record to suggest that any SCJ staff observed Wise's strange behavior or heard his bizarre comments, and it

is undisputed that the inmate witnesses did not contemporaneously report these matters to SCJ staff or anyone from VitalCore.

Also on December 11, 2019, the Sheriff requested an independent investigation surrounding Wise. The Ashland County Sheriff's Office conducted the investigation and ultimately determined that "the staff from [SCJ] did follow department SOP [standard operating procedures] and policy and that the staff did provide the appropriate level of medical care within their abilities." (Doc. No. 58-13 (Ashland County Investigation Report), at 4.) The report further concluded that "Wise was properly classified and housed in accordance with the jail standards." (*Id.*) Additionally, the Sheriff referred the matter to the Ohio Department of Corrections Bureau of Adult Detention ("ODC") for review and investigation. The ODC reported that it "did not identify any issues of non-compliance with the Standards for Jails in Ohio." (Doc. No. 58-14 (Email from ODC), at 2.)

### G. The Federal Lawsuit, Claims, and Summary Judgment Motions

On November 18, 2021, plaintiffs filed the present action in federal court. (*See* Doc. No. 1.) The complaint is far from a model of clarity. Though titled "Negligence," the First Clam for Relief appears to set forth a deliberate indifference claim, pursuant to 42 U.S.C. § 1983, against all defendants. (*See id.* ¶¶ 64–71.[10]) The complaint also raises two federal claims solely against the Sheriff and the Commissioners, pursuant to 42 U.S.C. §§ 1983 and 1988. The Second Claim raises

---

[10] In fact, the Court shares defendants' collective confusion regarding whether the First Claim sets forth a federal civil rights claim or a state law negligence claim. (*See* Doc. No. 60, at 2; Doc. No. 63, at 9–10.) For purposes of the pending summary judgment motions, and because the First Claim alleges "deliberate indifference" and cites § 1983 (*see* Doc. No. 1 ¶¶ 65–66), the Court assumes plaintiffs intended to plead the former. Nevertheless, to the extent the First Claim can be construed as raising a tort claim under Ohio law, the Court declines to exercise supplemental jurisdiction over it as discussed in this memorandum opinion, *infra*.

a "*Monell*[11] Policy Claim" for failing to maintain adequate policies to protect pretrial detainees from injuries due to suicide. (*Id*. ¶¶ 72–80.) The Third Claim alleges that the Sheriff and the Commissioners failed to adequately train and supervise SCJ staff, including the Officers. (*Id*. ¶¶ 81–84.) Additionally, the complaint asserts state law claims against the Officers and the VitalCore Defendants for intentional infliction of emotional distress (Fourth Claim) (*see id*. ¶¶ 85–89); and for Willful, Wanton, and Reckless Conduct (Fifth Claim) (*see id*. ¶¶ 90–93); and against all defendants for wrongful death (Sixth Claim) (*see id*. ¶¶ 95–102). Further, it is clear that the Officers and the VitalCore Defendants are sued "in their individual capacities[,]" (*see id*. ¶ 13), while the remaining defendants are sued only in their official capacities.

The Stark County Defendants and the VitalCore Defendants seek summary judgment in their favor as to all claims asserted against them in the complaint. Plaintiffs seek partial summary judgment, requesting judgment in their favor on the First and Second Claims.

## II.  STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

---

[11] *See Monell  v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (holding that "[l]ocal governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.").

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). In most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*,

14

351 F.3d 240, 247 (6th Cir. 2003). Under this standard, "the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment [motion]." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks and emphasis omitted) (citing *Anderson*, 477 U.S. at 247–48).

The typical summary judgment standard of review "poses unique issues" when cross motions for summary judgment are filed. *B.F. Goodrich Co. v. U.S. Filter Corp*., 245 F.3d 587, 592 (6th Cir. 2001). In such a case, the district court must evaluate each party's motion on its own merits, drawing all reasonable inferences against the moving party. *Id.* (citation omitted). If it is possible to draw inferences in either direction, then both motions for summary judgment should be denied. *Id.* at 592–93. The making of contradictory claims on summary judgment does not mean that if one is rejected the other must be accepted. *Id.*

## III.  STARK COUNTY DEFENDANTS' MOTION

Stark County Defendants argue that the Court must find, as a matter of law, that Wise was not deprived of any constitutional rights because no individual Officer was deliberately indifferent to any serious medical need Wise may have had. They continue that, because there was no constitutional violation by any Officer, there can be no municipal liability under *Monell*, and that, in any event, plaintiffs cannot causally link any county policy or training practice to Wise's death. They also argue that the Officers are entitled to qualified immunity, and dismissal of these defendants is appropriate for this additional reason. Finally, they argue that the Court should decline to exercise supplemental jurisdiction over the state law claims.

### A.  Stark County Officers were not Deliberately Indifferent

It is clear from the record that as of December 10, 2019, no SCJ corrections officer—

including any of the Officers—was aware that Wise had ever attempted self-harm or suicide while at the SCJ or that he posed a risk of self-harm at the time he took his life. (Doc. No. 53, at 16, 52–53, 57; Doc. No. 54, at 28; Doc. No. 58-5 ¶¶ 15–17; Doc. No. 58-8 ¶¶ 12–15; Doc. No. 58-9 ¶¶ 14–17; Doc. No. 58-10 ¶¶ 17–20.) Plaintiffs agree that the Officers had no knowledge of Wise's prior suicide attempts, or any information that would have led to them to believe that Wise posed an imminent threat of danger to himself on December 10, 2019. In fact, in their response brief, plaintiffs

> acknowledge that Sgt. James Stevic, Sgt. Eric Changet, C.O. Joseph Stephey, C.O. Nathan Thomas, and C.O. Danny Thompson ("the Officers") do not bear individual responsibility for Mr. Wise's death, as it has been made clear by all Defendants during the discovery phase of these proceedings that the policies and customs of the [SCJ] promulgated by the Stark County Defendants rendered it nearly impossible for any of the Officers to learn of Mr. Wise's severe mental health issues and repeated suicide attempts while previously incarcerated in [SCJ] despite their active efforts to do so. As such, Plaintiffs have no objection to judgment being entered in favor of Sgt. James Stevic, Sgt. Eric Changet, C.O. Joseph Stephey, C.O. Nathan Thomas, and C.O. Danny Thompson individually.

(Doc. No. 61, at 1–2.)

Based on the foregoing concession by plaintiffs, the Court hereby grants summary judgment in favor of the Officers—Sgt. James Stevic, Sgt. Eric Changet, C.O. Joseph Stephey, C.O. Nathan Thomas, and C.O. Danny Thompson—and dismisses all claims brought against them in their individual capacities.

### B. *Monell* Claims

As previously noted, the Sheriff and the Commissioners are sued only in their official capacities. A suit against an individual in his official capacity is the equivalent of a suit against the government entity employing him. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) ("As long as the government entity receives notice and an opportunity to

respond, an official-capacity suit is, in all respects other than name, to be treated as against the entity." (citation omitted)).

Municipalities are "persons" for purposes of § 1983 liability. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). But municipalities are only responsible for "their *own* illegal acts." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) (emphasis in original). "Municipal liability must rest on a direct causal connection between the policies or customs of the [municipality] and the constitutional injury to the plaintiff; 'respondeat superior or vicarious liability will not attach under § 1983.'" *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)); *Monell*, 436 U.S. at 691. A plaintiff seeking to impose municipal liability under § 1983 must demonstrate that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*; *see also Harris*, 489 U.S. at 385 ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional violation.")

"However, '[v]ery few cases have upheld municipal liability for the suicide of a pretrial detainee,'" and Sixth Circuit "cases clearly distinguish between deliberate indifference and negligence." *Troutman v. Louisville Metro. Dep't of Corrs.*, 979 F.3d 472, 489 (6th Cir. 2020) (quoting *Gray*, 399 F.3d at 617). As such, "a municipality [can]not be held liable where there was

17

no showing that the municipality's policymakers—as opposed to the individual officers directly involved in the inmate's suicide—ignored a known or apparent risk; while those policymakers may have been negligent, '[n]egligence does not establish a § 1983 claim.'" *Id*. (quoting *Molton v. City of Cleveland*, 839 F.2d 240 , 246–47 (6th Cir. 1988) (further citation omitted))).

Stark County Defendants argue that plaintiffs' concession regarding the Officers is fatal to their *Monell* claims. They posit that Sixth Circuit case law is clear that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (Doc. No. 67, at 9 (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (further citations omitted)). Stark County Defendants' reliance on cases, such as *Watkins* and the circumstances specific to that decision, overstates governing Sixth Circuit law.

It is well accepted that "[t]here must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails." *North v. Cuyahoga Cnty, Ohio*, 754 F. App'x 380, 389 (6th Cir. 2018) (citing *City of Los Angeles v. Heller*, 475, U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (per curiam)). "Whether and under what circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct is a more complicated question—one" that was addressed by the Sixth Circuit in *Winkler v. Madison Cnty*., 893 F.3d 877 (6th Cir. 2018). *Id*. There, the Court of Appeals acknowledged case law from the Sixth Circuit finding circumstances where municipal liability may exist despite the absence of a finding that an individual government actor has committed a constitutional violation. *Winkler*, 893 F.3d at 899 (citation omitted). That might occur, for instance, "when a government actor in good faith follows a faulty municipal policy. *Id*. at 900 (quoting *Epps v.*

*Lauderdale Cnty.*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, C.J., concurring)).[12]

Plaintiffs' theory of municipal liability appears to rely upon such a circumstance where the county's policies and customs, themselves, are alleged to have been responsible for the constitutional violation. Noting that generally inmates have a constitutional right to medical care, *see Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), plaintiffs argue that there was no system to red flag for corrections officers inmates who had previously attempted suicide in the SCJ. (Doc. No. 61, at 11–13 (citing Doc. No. 52, at 68.).) Further, plaintiffs underscore that "there was also apparently no way for the [SCJ corrections] staff to learn of an inmate's history [of attempted suicides] even when they were affirmatively investigating it to try to determine whether it was safe to move [an inmate] out of a protective cell." (*Id.* at 13–14 (citing Doc. No. 52, at 123–24).) According to plaintiffs' expert, had SCJ corrections staff been provided information regarding Wise's prior suicide attempts, they could have insisted that Wise be evaluated by mental health staff before he was transferred, and the decision to move him out of a control cell might not have been made. (Doc. No. 55 (Deposition of Robert Marcello, Ph.D), at 50 ("Had Mr. Wise been evaluated by mental health, we might not – we probably wouldn't be having this conversation [i.e., conducting an expert witness deposition in a federal civil rights action])".) In other words, had the county's policies allowed SCJ staff to learn of Wise's past suicide attempts and prior mental health status, the outcome could have been different.

Plaintiffs, however, have not identified any evidence in the record to show that the county's

---

[12] Other possible situations where municipal liability may exist without a finding of individual government actor liability include "where municipal liability is based on the actions of individual government actors other than those who are named as parties. Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Epps*, 45 F. App'x at 335 (Cole, C.J., concurring) (quotation marks and citations omitted).

policies (or purported gaps in the policies) were the "moving force" behind a pattern of persistent misconduct. *Monell*, 436 U.S. at 694. The consequences of an alleged constitutionally deficient policy must be known or obvious. *MacLean-Patterson v. Erie Cnty.*, 488 F. Supp. 3d 581, 589 (N.D. Ohio 2020); *see Winkler*, 893 F.3d at 901 (a plaintiff must demonstrate that the [government] action was taken with 'deliberate indifference' as to its known or obvious consequences" (citing *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)). Yet, plaintiffs have not identified any prior instances of suicides in SCJ caused by a failure to flag the individual's prior suicide attempts or prior serious mental health incidents that would have put the county on notice that its policies were arguably deficient.

Additionally, plaintiffs have failed to identify facts that, if believed, would show a direct causal link between any policy and the alleged constitutional deprivation. It is undisputed that Wise denied during his pre-booking screen and his pre-booking healthcare screen that he was entertaining any current thoughts of suicide or self-harm. At no time prior to his death did Wise apprise SCJ corrections officers or medical personnel that he was considering such a course of conduct, or otherwise demonstrate to any corrections officer or medical personnel that he was suicidal. And when his behavior did change, it was sudden and without warning to any staff member. In light of the fact that Wise was not presenting as suicidal until immediately prior to death, knowledge that Wise had previously attempted suicide would not have altered the individual defendants' actions. (*See, e.g.,* Doc. No. 53, at 43 ("I think I would have [done] exactly the same thing I did[, if I had known about the prior attempts].") Even plaintiffs' expert acknowledged that suicide risk is assessed in real-time, and while past history can be one risk factor, it does not present the same urgency to take immediate action that exists with present thoughts to engage in self-harm.

(Doc. No. 55, at 33; *see* Doc. No. 44, at ¶¶ 43, 64.)

Of course, had Wise exhibited any current suicidal ideation, SCJ had policies in place that would have provided Wise assistance in the form of a secure placement, precautions, and heightened and more frequent watches. (*See* Doc. No. 44-14; *see also* Doc. No. 44 ¶ 69 ("For inmates who have been deemed a risk of suicide by medical/mental health staff, SCJ has implemented policies for staff to follow in successfully managing this special needs population."); Doc. No. 39, at 7 (SCJ Suicide Prevention and Response Policy complies with state law).)

Instead of identifying any policies that could be causally linked to Wise's death, plaintiffs merely identify policies the county *could have* put in place to prevent Wise's suicide, but allegations that a suicide "could have" been prevented are insufficient since "[i]n virtually every instance where a person has had his or her constitutional rights violated by a [municipal] employee, a § 1983 plaintiff will be able to point to something the [municipality] 'could have done' to prevent the unfortunate incident." *Harris*, 489 U.S. at 392; *see Troutman*, 979 F.3d at 490 (citing *Gray*, 399 F.3d at 619 (further citation omitted)); *see, e.g., Parker v. Ottawa Cnty.*, No. 3:19-cv-665, 2022 WL 875245, at *8 (N.D. Ohio Mar. 22, 2022) (county's failure to implement a policy requiring a medical screening of all pretrial detainees before placement in a disciplinary lockdown could not be considered the moving force behind plaintiff's suicide). "It is easy, after a tragedy occurs, to see a gap in hindsight. This is plainly insufficient to establish a municipality's liability." *Modd v. Cnty. of Ottawa*, No. 1:10-cv-337, 2012 WL 5398797, at *26 (W.D. Mich. Aug. 24, 2012) (citing *Starcher v. Corr. Med. Sys., Inc*., 7 F. App'x 459, 466–67 (6th Cir. 2001)); *see also Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 418 (6th Cir. 2006) (merely identifying "a list of measures that in hindsight that if taken possibly could have saved [decedent's] life" insufficient to show

municipality's policy was the moving force behind the constitutional deprivation).

Having failed to identify facts that, if believed, would have demonstrated that the county's policies (or lack thereof) resulted in the deprivation of a constitutional right, plaintiffs' *Monell* policy claim (Second Claim) fails as a matter of law. Accordingly, Stark County Defendants' summary judgment motion is granted as to this claim.[13]

## IV.  PLAINTIFFS' MOTION ON THE SECOND CLAIM

As part of their partial motion for summary judgment, plaintiffs seek judgment in their favor on the same *Monell* policy claim (Second Claim). (Doc. No. 56, at 5.) In support of summary judgment on this claim, plaintiffs rely on the same arguments and evidence that constituted their opposition to Stark County Defendants' summary judgment motion. In particular, plaintiffs rely on the absence of a policy permitting officers to learn of an inmate's past mental health status, including flagging inmates who have previously attempted suicide at SCJ. (*Id.* at 18–22.) Having determined that these same facts, when viewed in a light most favorable to plaintiffs, fail to

---

[13] Stark County Defendants also moved for summary judgment on plaintiffs' *Monell* failure to train claim (Third Claim). (*See* Doc. No. 58, at 23–26.) In their opposition, plaintiffs failed to respond to arguments relating to their *Monell* training claim or otherwise argue against summary dismissal of the Third Claim. (*See generally* Doc. No. 61.) "It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment." *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) (collecting cases); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Given that plaintiffs' response brief is limited to addressing their *Monell* policy claim (Second Claim), the Court finds that plaintiffs abandoned their *Monell* training claim (Third Claim). And, in any event, the record is clear that the county maintained as part of its Suicide Prevention and Response Plan a policy addressing training of its employees, which "satisfies not only the [Ohio Administrative Code] jail standards but meets generally accepted practices concerning managing special needs inmates concerning suicide, when staff have been made aware of their intentions." (Doc. No. 44 ¶ 118; *see* Doc. No. 44-14, at 84.) Moreover, the record shows SCJ employees received training on suicide prevention and response. (*See, e.g.,* Doc. No. 53, at 33.) Finding no evidence that would support a finding that there existed "(1) a pattern of similar constitutional violations by untrained employees or (2) a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation[,]" summary dismissal of the Third Claim is appropriate. *See Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 323 (6th Cir. 2023) (internal quotation marks and citation omitted).

demonstrate that the county's policies (or gaps therein) were the moving force behind a pattern of persistent misconduct or were otherwise causally connected to Wise's unfortunate death, plaintiffs cannot prevail on their motion seeking summary judgment on the same claim. Accordingly, plaintiffs' motion for summary judgment on the Second Claim is denied.

## V. VITALCORE DEFENDANTS' MOTION

Harmon-Rodriguez and Vaughan, who are sued in their individual capacities, argue on summary judgment that plaintiffs' federal claim under § 1983 (First Claim) should be dismissed against them because they were not deliberately indifferent toward Wise's serious medical condition and because they are entitled to qualified immunity.

### A. General Law on Qualified Immunity

The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citation omitted). "Qualified immunity provides [government officials] 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013) (per curiam)). Qualified immunity will apply "'if [officials] of reasonable competence could disagree on the issue.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful). "The principle is well settled that private

medical professionals who provide healthcare to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Winkler*, 893 F.3d at 890 (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an official's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson*, 555 U.S. at 236.

### B. Deliberate Indifference Standard

"Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment. An offic[ial] violates that right if that offic[ial] shows deliberate indifference to [a pretrial detainee's] serious medical needs[.]" *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (internal citations and quotation marks omitted; some in *Hyman*); *see also Mercer v. Athens Cnty., Ohio*, No. 22-3904, 2023 WL 4242767, at *4 (6th Cir. June 29, 2023) (noting that for prisoners, the right flows from the Eighth Amendment, while, for pretrial detainee, the right "arises under the Fourteenth Amendment's Due Process Clause"). The Sixth Circuit has articulated the standard

for a Fourteenth Amendment claim of deliberate indifference as requiring that a plaintiff show (1) the existence of a sufficiently serious medical need, and (2) that each defendant "'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine*, 60 F.4th 305, 315–16 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (internal quotation marks and further citation omitted)). This standard is "more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner*, 14 F.4th at 596 (quotation marks and citation omitted).

Inmates do not have a guaranteed constitutional "right 'to be screened correctly for suicide tendencies,' however, 'prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.'" *Troutman*, 979 F.3d at 482 (quoting *Comstock v. McCray*, 273 F.3d 693, 702 (6th Cir. 2001) (further citation omitted)). For prison suicide § 1983 actions, the objective component requires that it was "obvious that there was a 'strong likelihood' that an inmate would attempt suicide." *Troutman*, 979 F.3d at 483 (quoting *Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020) (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005))). "It is insufficient to show that an official 'acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide.'" *Id.* (quoting *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013) (emphasis in original)). "This distinction is critical 'because a finding of deliberate indifference requires a sufficiently culpable state of mind, which the Supreme Court has equated with criminal recklessness." *Id.* (quoting *Galloway*, 518 F. App'x at 336) (further citation omitted)); *see Brawner*, 14 F.4th at 596.

Plaintiffs will have demonstrated a "strong likelihood" of suicide if the suicide was "clearly

foreseeable." *Gray*, 399 F.3d at 616. The Sixth Circuit has identified several risk factors indicating a "strong likelihood" of suicide, including: (1) a history of alcohol and substance abuse, (2) feelings of hopelessness, (3) impulsive or aggressive tendencies, (4) isolation, (5) access to methods for suicide, (6) a history of mental illness, particularly clinical depression, and (7) prior traumatic brain injuries. *Troutman*, 979 F.3d at 484. Additionally, a strong likelihood of suicide generally requires evidence that the inmate was already on suicide watch, had previously attempted suicide under comparable conditions, or had recently indicated a desire to self-harm. *Downard*, 968 F.3d at 601.

### 1. The Objective Component

"A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Green v. Crawford Cnty, Mich.*, 22 F.4th 593, 607 (6th Cir. 2022) (internal quotation marks and citation omitted); *see Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (similar). A plaintiff meets the objective component by showing that the pretrial detainee exhibited suicidal tendencies during his or her detention or that the detainee "posed a strong likelihood of another suicide attempt." *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006). When addressing the objective component, the Court considers "'past threats or attempts at suicide,' even though such past attempts do not necessarily mean the detainee will do so again." *Troutman*, 979 F.3d at 484 (quoting *Perez*, 466 F.3d at 425). Here the record reflects that Wise had previously attempted suicide at SCJ, and that he been on suicide precautions during past incarcerations at SCJ. *See Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 416 (6th Cir. 2006) ("The Sixth Circuit has long recognized that psychological needs manifesting themselves in

26

suicidal tendencies are serious medical needs[.]" (internal quotation marks and citations omitted)). Further, it is beyond debate that Wise's underlying mental illnesses ultimately resulted in death. *See Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) (noting that the Sixth Circuit has "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component").

Based on the foregoing, the Court finds that plaintiffs have demonstrated the existence of a serious medical need.

### 2. *The Subjective Component*

As noted, a defendant is deliberately indifferent to a serious medical need when he or she acts "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine*, 60 F.4th at 317 (internal quotation marks omitted). This standard is judged "based on the information that was available to [the official] at the time." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014). Moreover, because this inquiry focuses on the official's state of mind, "[t]he subjective component [of a deliberate indifference claim] must be addressed for each offic[ial] individually." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008) (quotation marks and citation omitted); *see Winkler*, 893 F.3d at 891; *see also Greene*, 22 F.4th at 607 (The Court "cannot impute knowledge from one defendant to another[,] [rather it] must evaluate each defendant individually[.]" (quotation marks and citation omitted)).

### a. Nurse Vaughan

Vaughan did not perform the initial health screen of Wise, nor is there any evidence that she came into contact with Wise during any of his stays in the SCJ, including the period of incarceration in December 2019 that culminated in his death. There is also no evidence that she was aware of any of his prior suicide attempts. Viewing the evidence in a light most favorable to plaintiffs, and resolving all disputed facts in their favor, the only involvement Vaughan had with Wise's case was Thompson's conversation(s) with her on December 9, 2019, wherein he requested that Wise be seen by someone from VitalCore, and Vaughan advised that she would pass along the request to Harmon-Rodriguez. (Doc. No. 54, at 21–22, 84.) There is nothing in the record to suggest that Thompson indicated to Vaughan that there was a medical reason for the request, or that Wise had exhibited any warning signs that he was suicidal. There is nothing about this involvement that can support a finding that Vaughan acted deliberately and/or recklessly as to an unjustifiably high risk that Wise would attempt to take his life.

Even if Vaughan neglected to pass along to Harmon-Rodriguez the request that Wise be "seen" by someone from VitalCore before he was transferred (a fact that is unclear from the record), under these circumstances, the most that can be concluded is that she was negligent. Negligence alone, however, is insufficient to deprive an official of qualified immunity. *See Brawner*, 14 F.4th at 596. The Court finds that Vaughan is entitled to qualified immunity.[14]

---

[14] Plaintiffs make much of the fact that when Vaughan was originally asked about this event during the Stark County Sheriff Office's internal investigation, she denied any knowledge of the matter, but later contacted Sgt. Kennedy and informed him that she did recall speaking with Thompson and that his recollection of the conversation(s) was correct. (Doc. No. 56-12, at 10.) Plaintiffs fail to explain how Vaughan's initial memory lapse, intentional or accidental, demonstrates that Vaughan was deliberately indifferent to Wise's need for medical intervention.

### b. Nurse Harmon-Rodriguez

At all times relevant to the present action, Harmon-Rodriguez was the coordinator of mental health for VitalCore. (Doc. No. 52, at 73–74.) Like Vaughan, she was not responsible for Wise's initial health screening, and there is no evidence that she observed or treated Wise at any time in December 2019. She did, however, have prior contact with Wise. Specifically, the record demonstrates that in June 2019 she prepared paperwork that reflected that Wise had been placed on precautions for self-harm and included entries that noted that Wise had attempted suicide in 2011. (*See* Doc. No. 56-11, at 2.) She also signed an application in August 2019 for Wise's emergency admission for psychiatric treatment because Wise displayed self-harm/suicidal behavior and had been placed on suicide precautions. (Doc. No. 62-14, at 4.)

While Harmon-Rodriguez testified that in December 2019 she did not "put the pieces together" that Wise was the same individual she had documented in June and August 2019, viewing the record in a light most favorable to plaintiffs, there is at least a question of fact as to whether Harmon-Rodriguez was aware that Wise was the same individual. Additionally, while Harmon-Rodriguez vehemently denies that any corrections officer asked her to perform a mental health evaluation—and that she was only asked to confirm whether Wise was in a control cell for reasons involving his mental health—the facts, when viewed in a light most favorable to plaintiffs, suggest that Harmon-Rodriguez was asked and failed to "check in" on Wise or otherwise ignored a request that Wise "be seen by mental health" before he was moved. (*See* Doc. No. 54, at 21–22, 84.) Plaintiffs posit that these two disputed facts are sufficient to deny Harmon-Rodriguez summary judgment. The Court disagrees.

Plaintiffs underscore that Wise "had at least three documented suicide attempts while previously in the custody of" SCJ. (Doc. No. 62, at 11.) The record, taken in a light most favorable to plaintiffs, only supports a finding that Harmon-Rodriguez was aware of the two attempted suicides in 2011—eight years prior to his final incarceration at SCJ.[15] (*See* Doc. No. 56-11 (screening performed by Harmon-Rodriguez, noting prior suicide attempts in 2011).) The Sixth Circuit "has held that a prison official's duty to recognize an inmate's risk of committing suicide has a temporal component." *Andrews v. Wayne Cnty., Mich.*, 957 F.3d 714, 722 (6th Cir. 2020) (citing *Linden*, 167 F. App'x at 421 (holding that to be held liable, "a prison official must be cognizant of the significant likelihood that an inmate may *imminently* seek to take his own life" (emphasis added, further quotation marks and citation omitted))). Even plaintiff's expert conceded that suicide risk is assessed in real-time and that past suicide attempts do not suggest the same sense of urgency as contemporaneous warning signs. (Doc. No. 55, at 33.) The Court cannot conclude that Harmon-Rodriguez should have perceived a strong likelihood of suicide on December 10, 2019, from unsuccessful suicide attempts that occurred eight years earlier.

Plaintiffs also point to the fact that Harmon-Rodriguez, herself, filled out paperwork in August 2019 requesting emergency admission for psychiatric treatment for Wise, citing suicidal behavior and the imposition of suicide precautions. (Doc. No. 62, at 11 (citing Doc. No. 62-14, at 2).) They suggest that, armed with the knowledge that Wise had been on precautions four months prior to December 2019, Harmon-Rodriguez's failure to respond to "repeated requests" to have

---

[15] The third documented suicide attempt occurred in June 2018. (Doc. No. 56-6, at 2; *see* Doc. No. 56-6, at 1.) There is nothing in the documentation regarding this event that would suggest that Harmon-Rodriguez was aware of the 2018 attempt (which was still more than one year before Wise's suicide) or otherwise played any role in responding to it, and the Court cannot impute the knowledge of any individual who was involved to Harmon-Rodriguez. *See Green*, 22 F.4th at 607.

Wise seen demonstrated a deliberate indifference to a strong likelihood of suicide that was clearly foreseeable. (*Id.* at 13–14.) Yet, the fact remains that Wise was not presenting as suicidal at booking and his placement in a control cell was not prompted by mental health or suicidal concerns. The Sixth Circuit has concluded that "even an inmate's recent threats of suicide do not make it obvious that he poses a 'strong likelihood' of suicide, if he denies feeling suicidal at intake."[16] *Downard*, 968 F.3d at 601 (citing *Nallani v. Wayne Cnty.*, 665 F. App'x 498, 507–08 (6th Cir. 2016) (holding that an inmate who informed the intake officer that he felt suicidal during arrest, had a history of self-harm, and had failed to take a prescribed anti-depressant for "months" did not present a "strong likelihood" of attempting suicide because he denied feeling suicidal when asked by the officer)); *see also Perez*, 466 F.3d at 434–35 ("The fact that [the officer] knew [the detainee] was or might be suicidal at earlier times simply does not support the inference that [the officer] knew that [the detainee] posed a risk of suicide *at the later time*, when [the detainee] appeared calm and claimed to be in a much-improved state of mind.") (Griffin, J., concurring) (emphasis in original).

Further, even when viewed in a light most favorable to plaintiffs, there is nothing about the requests to have Wise "seen by mental health" that would have or should have alerted Harmon-Rodriguez to a strong likelihood that Wise would take his life. (*See* Doc. No. 62, at 14.) Rather, Thompson testified that, aware that Wise was already going to be removed from his cell so that he

---

[16] By contrast, in *Troutman*, a case cited by plaintiffs, the decedent-pretrial detainee attempted suicide within 24 hours of being arrested on drug offenses. *Troutman*, 979 F.3d at 477. Shortly after this unsuccessful attempt, a nurse conducted a medical screening and noted that the decedent was "currently thinking about suicide" and had "a plan or suicide instrument in [his] possession." *Id.* In reversing the district court's grant of summary judgment in favor of a corrections officer who placed the decedent in a solitary confinement cell, the court ruled that "a reasonable jury could find that [the officer] was subjectively aware of the substantial risk to [the decedent. The officer] knew of [the decedent's] suicide attempt at booking [and] knew that placing the [decedent] in solitary confinement 'harbor[ed] a risk' given [the decedent's] prior suicide attempt." *Id.* at 485.

could receive an x-ray for a possible fracture to his hand, he believed that "the best option was just to get him seen then [by someone from mental health]" "before [Sergeant Seaman] would move him" from the control cell. (Doc. No. 54, at 20–21.) Thompson did not have (or share with Vaughan or Harmon-Rodriguez) any concerns about Wise's risk of suicide. In fact, when Thompson first spoke with Harmon-Rodriguez on December 10, 2019, he advised her that Wise was sleeping in his cell. (*Id*. at 27.)

Even plaintiffs' expert could not conclude that any of the defendants, including Harmon-Rodriguez, acted deliberately. When asked if he thought any of the purported errors or omissions by the individual defendants were intentional, he responded,

> If you're asking did—do I think that anyone intentionally disregarded a request or—that—that's not my impression, and I don't think I said that. I don't think—I don't think people—in my experience, sometimes things happen. People don't do what they should have done in retrospect. Could have done things differently, and had they done thinks [sic] differently, bad outcomes could have been prevented. I don't think this is a case where someone intentionally did—did or didn't do something. I think it's—I'm not doing a good job of explaining myself. I don't think anyone purposefully did anything that led to his death. I think people didn't follow through the way they were supposed to follow through and that contributed to his death, and, you know, that—then that's a problem, but that—to me, that is different than someone intentionally just disregarding something.

(Doc. No. 55, at 56–57.) Ultimately, plaintiffs' expert speculated that "*if* [Harmon-Rodriguez] had responded to the request" to see Wise, and "*if* [Harmon-Rodriguez] had determined that [Wise] was suicidal, [Harmon-Rodriguez] would have put him on [suicide] precautions." (*Id*. at 50 (emphasis added).) He conceded, however, that Harmon-Rodriguez could have evaluated Wise and determined that he was not suicidal, and, in that event, he would have been cleared to be moved and he "could have died by suicide anyway[.]" (*Id*.)

Given the tragic outcome, it is tempting to employ such logic in hindsight to criticize Harmon-Rodriguez for allegedly failing to promptly respond to requests that Wise be seen before he was moved out of his control cell. Yet, hindsight alone cannot satisfy the subjective component of the deliberate indifference test, even under the recently modified (and lowered) recklessness standard set forth in *Brawner, supra. See generally Lumbard v. Lillywhite*, 815 F. App'x 826, 833 (6th Cir. 2020) (rejecting argument that prison doctor was "deliberately indifferent," noting that "[o]nly with the benefit of hindsight could one deem [the inmate's] then-undiagnosed multiple sclerosis 'obvious' and thus requiring treatment" (citing *Rouster*, 749 F.3d at 453 (noting that the deliberate-indifference "standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done. . . . We must judge their actions based on the information available to them at the time"))); *see also Cobbs v. Pramstaller*, 475 F. App'x 575, 583 (6th Cir. 2012) ("While [the inmate's] need for the second operation seems evident in hindsight, we cannot conclude that [the doctor's] decisions to delay surgery constituted deliberate indifference in light of his limited knowledge.")

Applying the facts as they existed on December 9 and 10, 2019, there was nothing about Wise's incarceration—or Harmon-Rodriguez's interactions with SCJ corrections officers prior to Wise's removal from the control cell—that would have alerted Harmon-Rodriguez to a strong likelihood that Wise would commit suicide. It cannot be said, therefore, that Harmon-Rodriguez intentionally ignored or recklessly failed to act reasonably to mitigate the risk Wise's serious medical need posed to his continued wellbeing. Wise did eventually exhibit suicidal ideations but it was only after he was moved. His condition changed drastically, quickly, and without warning, and without opportunity for action by Harmon-Rodriguez or SCJ staff.

While viewing the evidence in the light most favorable to plaintiffs could lead to a conclusion that Harmon-Rodriguez may have been negligent in failing to act with haste, any such negligence does not rise to the level of deliberate indifference merely because, in hindsight, quicker action might have resulted in a different outcome. Under these circumstances, the Court cannot conclude that Harmon-Rodriguez acted deliberately and/or recklessly in the face of an unjustifiably high risk that Wise would take his life when she allegedly failed to follow through with requests to have Wise "seen." *See Brawner*, 14 F.4th at 597. Thus, Harmon-Rodriguez is entitled to summary judgment on the First Claim.

## VI.    PLAINTIFFS' MOTION ON THE FIRST CLAIM

Plaintiffs also seek summary judgment on the First Claim. In light of the fact that the Court has determined that the remaining two individual defendants are entitled, at a minimum, to qualified immunity on this claim, the motion is denied.

More fundamentally, plaintiffs' motion must be denied for a more basic reason: in advocating for summary judgment on this claim, plaintiffs rely on the wrong standard. In their motion, plaintiffs identify the state standard for negligence claims. (*See* Doc. No. 56, at 13.) They argue that "Wise was in the custody of [SCJ], and as such his custodians—including all of the named Defendants—owed him a duty of care that they clearly breached, resulting in his imminently foreseeable death." (*Id*. at 16.) Even if plaintiffs met this negligence standard, their federal claim would fall short.

It is well settled that mere negligence, even if proven, is insufficient to establish liability for deliberate indifference under § 1983. *See Farmer*, 511 U.S. at 836 ("With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or

34

knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness.) (collecting cases); *Brawner*, 14 F.4th at 596 ("What then is required to establish deliberate indifference in this context? Mere negligence is insufficient."); *Lane v. Green*, No. 5:21-cv-1377, 2022 WL 60215, at *2 (N.D. Ohio Jan. 6, 2022) ("Deliberate indifference is characterized by obduracy or wantonness, not inadvertence or good faith error. . . . Liability cannot be predicated solely on negligence." (citations omitted)).

Plaintiffs' motion for summary judgment on the First Claim is premised entirely on the alleged negligence of defendants. (*See* Doc. No. 56,  at 13–16.) Because negligence is clearly insufficient to warrant judgment as a matter of law in favor of plaintiffs on the First Claim, and assuming that the First Claim raises a federal claim under § 1983, plaintiffs' motion for summary judgment on the First Claim premised on defendants' negligence is denied.[17]

## VII.  SUPPLEMENTAL JURISDICTION

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. E.2d 391 (1994). Federal law vests district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. If a court has original jurisdiction, it also has supplemental jurisdiction over other claims that are so related to the federal claims that they stem from the same controversy. 28 U.S.C. § 1367(a).

---

[17] Moreover, as set forth above, there is a question of fact as to (1) whether Harmon-Rodriguez knew or should have known about Wise's past mental health challenges and prior suicide attempts and (2) whether Harmon-Rodriguez was asked to perform a mental health evaluation on Wise. Even if a federal civil rights claim could be established solely with evidence of negligence, these disputed facts would preclude any such determination on summary judgment.

But as a matter of statute, a court may decline supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *see Landefeld v. Marion Gen. Hosp., Inc*., 994 F.2d 1178, 1182 (6th Cir. 1993). And, as a matter of comity and justice, when adjudication of a summary judgment motion leaves a plaintiff with no federal cause of action, courts should not exercise supplemental jurisdiction over the state claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) (holding that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

Here, no federal claims remain, and no overriding interests of judicial economy, comity, or convenience warrant this Court's exercise of supplemental jurisdiction over the state claims. The claims for intentional infliction of emotional distress; willful, wanton, and reckless conduct; wrongful death; and negligence (to the extent the First Claim properly asserts such a claim) are creatures of Ohio state law. The Ohio courts are as capable as this Court to resolve those claims. *See Wynn v. Morgan*, 861 F. Supp. 622, 637 (E.D. Tenn. 1994). Under these circumstances, dismissal of the state law claims is appropriate. *See Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009); *McGuire v. City of Moraine*, 178 F. Supp. 2d 882, 903 (S.D. Ohio 2001). Accordingly, the Court declines to exercise its supplemental jurisdiction over the state law claims.

## VIII.  CONCLUSION

For the reasons stated above, the Court orders as follows:

(1) Stark County Defendants' motion for summary judgment on plaintiffs' federal claims is GRANTED;

(2) All claims against defendants Stevic, Changet, Stephey, Thomas, and Thompson are DISMISSED;

(3) VitalCore Defendants' motion for summary judgment as to the First Claim is GRANTED and defendants Harmon-Rodriguez and Vaughan are GRANTED QUALIFIED IMMUNITY on the First Claim;

(4) Plaintiffs' motion for summary judgment is DENIED;

(5) The Court declines to exercise supplemental jurisdiction over the state law claims against the remaining defendants, and consequently the state law claims are DISMISSED WITHOUT PREJUDICE; and

(6) This case is CLOSED.

**IT IS SO ORDERED**.


Dated: July 24, 2023

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT COURT**
**CHIEF JUDGE**